UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOHN TETTING, JR.,
    Petitioner,

v.                                                         Case No. 19-C-0031

PAUL KEMPER, Warden,
    Respondent.

## DECISION AND ORDER

John Tetting, Jr., has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, in which he challenges his conviction for second-degree intentional homicide as party to a crime.

## I. BACKGROUND

Tetting's conviction arises out of the murders of Joshua Alderman and Tabitha Nealy. The evidence at trial showed that Tetting's associate, David Turner, shot the victims to death. On the night of the murders, Tetting drove Turner to a location in Juneau County, Wisconsin, where Turner planned to meet Alderman. While Tetting remained in the car, Turner got into the backseat of the vehicle occupied by Alderman and Nealy and shot them both. Afterwards, Turner told Tetting to see if Alderman and Nealy were dead. Tetting did so and reported that Alderman was dead but Nealy was moving. Turner then shot Nealy a second time and killed her. Once the victims were dead, Tetting helped Turner dispose of evidence. The state charged Tetting with two counts of first-degree intentional homicide, as party to a crime, in violation of Wis. Stat. § 940.01 and § 939.05. At trial, and over Tetting's objection, the court instructed the jury on the lesser included offense of second-degree intentional homicide in addition to the

charged offense of first-degree intentional homicide. The jury found Tetting not guilty of first- or second-degree intentional homicide as to Alderman. As to Nealy, the jury found Tetting not guilty of first-degree intentional homicide but guilty of second-degree intentional homicide as party to the crime.

After Tetting was convicted, his counsel learned that, during jury deliberations, a juror may have made a racially biased statement and that some jurors may have introduced extraneous information into the deliberations. Tetting's postconviction counsel filed a motion with the trial court to investigate these matters and, if appropriate, vacate Tetting's conviction. The motion alleged that the following occurred during jury deliberations: (1) one juror had said that Tetting was "a black kid from Milwaukee" who "had to be guilty," ECF No. 13-2 at 13 of 203; (2) some jurors said that because Tetting was "a bad guy," "deals drugs," and was "from the big city," he should be convicted even if he was innocent of the crimes charged, *id.*; (3) one juror, J.F., said he was in a biker gang, was associated with a drug dealer in Rockford, and discussed how drug dealers conduct business; (4) one juror, J.B., used a definition of reasonable doubt that was not in the court's instructions; (5) two jurors related information about incidents of which they were aware involving persons being convicted as parties to a crime; (6) some jurors made statements about Turner's and Tetting's convictions and sentences that were not based on evidence admitted at trial.

The trial court eventually held an evidentiary hearing on the postconviction motion. However, prior to this hearing, the court made a preliminary ruling regarding the scope of juror testimony at the hearing. This ruling was based on Wis. Stat. § 906.06(2), which limits a juror's competency to testify on certain matters relating to jury

2

deliberations. As is relevant to this case, the rule provides that a juror may not testify about such matters unless the testimony relates to "the question whether extraneous prejudicial information was improperly brought to the jury's attention." Wis. Stat. § 906.06(2). Based on this rule, the trial court determined that the jurors could testify about whether an extraneous definition of reasonable doubt was presented to the jury and whether extraneous information regarding Tetting's and Turner's convictions and sentences was presented to the jury. The court also determined that, under *After Hours Welding, Inc. v. Laniel Management Co.*, 108 Wis. 2d 734 (1982), the jurors could testify about any racial bias that may have affected the verdict, including the alleged comment about Tetting's being a Black kid from Milwaukee who had to be guilty. However, the court determined that the jurors could not testify about other matters, including (1) whether jurors said that Tetting was "a bad guy from the big city who dealt drugs," (2) whether a juror was in a biker gang and knew drug dealers, and (3) whether some jurors related information about knowing people who were convicted as parties to a crime. The trial court found that these three matters did not relate either to racial bias or to the consideration of impermissible extraneous information.

At the evidentiary hearing, all twelve jurors testified. Every juror testified that he or she did not take Tetting's race into account when determining guilt or innocence. However, two jurors, C.E.[1] and T.H., testified that one juror stated that Tetting was guilty because he was Black and from the inner city. Juror C.E. was sure that the statement was made, but she could not remember who said it, other than that the person who said

---

[1] C.E. changed her name between the trial and the postconviction hearing. She is identified in some records by her prior initials, C.G.

it was female. Juror T.H. testified that he heard someone say "something similar" to "he's a black kid from Milwaukee, he's got to be guilty," but he could not remember who said it. *See* ECF No. 13-14 at 16–17. However, he also testified that he did not hear anyone say that Tetting was guilty or should be convicted because of his race. *Id.* at 16. In an affidavit T.H. submitted before the hearing, he did not state that he heard the racially biased statement and instead averred that he did not remember any racial comments being made. At the hearing, the other ten jurors denied hearing or making comments about Tetting's race.

Some jurors testified that one juror, J.B., used a definition of reasonable doubt that was not in the court's instructions. Those jurors did not claim that J.B. derived this definition from an external source, such as a dictionary. Rather, from their testimony, it appeared that the jury generally debated the meaning of reasonable doubt in the court's instructions. Juror J.B. apparently had strong beliefs on the subject and told the rest of the jurors what he thought the term meant. One juror, C.E., testified that she believed J.B. derived his interpretation of the term from his experience working as a security guard at a tribal casino. *See* ECF No. 13-13 at 62. When J.B. testified, he denied using a definition of reasonable doubt that was not in the court's instructions. *Id.* at 23–24.

The jurors also testified about whether they considered extraneous information concerning Turner's conviction for the murders of Nealy and Alderman and concerning Tetting's having been incarcerated during the trial. In general, the jurors testified that they believed Turner had been convicted of Nealy's and Alderman's murders. However, none of them claimed that they formed this belief by consulting an external source, such as a newspaper. Their testimony indicated that they likely drew the conclusion that

4

Turner had been convicted of the murders because Turner testified at the trial that he shot Nealy and Alderman. Similarly, some jurors testified that they believed Tetting was incarcerated and possibly serving a seven-year sentence. However, they did not identify any specific external source of this information. Rather, it appeared that they drew this conclusion from the fact that the murders occurred in 2007 but the trial did not occur until 2014.

After the hearing, the trial court issued an oral ruling denying the postconviction motion. *See* ECF No. 13-15. Regarding racial bias, the court determined that the evidence did not establish that a racially biased statement was made and that, even if such a statement was made, the verdict itself was not the product of racial bias. *Id.* at 26–29. The court acknowledged that juror C.E. testified that someone said that because Tetting was Black and from Milwaukee he had to be guilty. However, the court emphasized that 10 other jurors said that no such statement was made and that the remaining juror, T.H., gave inconsistent statements about whether such a statement was made. Further, the court noted that all twelve jurors testified that they were not biased against Tetting because of his race. *Id.* at 23–24.

Regarding reasonable doubt, the court found that the evidence did not establish that extraneous information reached the jury. The court noted that although some jurors testified that J.B. had has own understanding of the term reasonable doubt, no juror testified that J.B. derived this understanding from an extraneous source, such as a dictionary. *See* ECF No. 13-15 at 89. Further, the court noted that J.B unequivocally denied bringing an extraneous definition of reasonable doubt into the courtroom. *Id.* at 9.

5

Finally, the court found that the evidence did not establish that extraneous information concerning Turner's and Tetting's convictions or sentences reached the jury. The court found that the jurors' beliefs about these matters were derived from the evidence and arguments at trial, rather than from an extraneous source. *Id.* at 34–35, 38. Although the court thought that extraneous information concerning Turner's convictions "may" have reached the jury, it concluded that this information could not have been prejudicial because, among other reasons, Turner testified at trial that he shot Nealy and Alderman. *Id.* at 34–35.

Tetting appealed his conviction to the Wisconsin Court of Appeals, arguing, among other things, that the trial court erred in denying his motion for a new trial based on the jury's racial bias and consideration of extraneous information.[2] Tetting first argued that the trial court erred in precluding the jurors from testifying about certain matters—including the alleged statement that Tetting was "a bad guy from the big city who dealt drugs"—on competency grounds. Tetting then argued that the trial court erred in finding, based on the evidence adduced at the evidentiary hearing, that the verdict was not prejudicially tainted by racial bias and that the jurors did not consider extraneous information concerning reasonable doubt.

---

[2] The other issues Tetting raised on appeal were that the trial court erred by instructing the jury on second-degree intentional homicide over his objection and that the trial court erred by failing to provide a more specific answer to the jury's question about coercion and aiding and abetting. Although Tetting raised these two claims in his federal petition, I previously dismissed them because Tetting had not fairly presented the federal aspects of the claims to the state courts. *See* ECF No. 12.

6

During his direct appeal, Tetting did not argue that the trial court erred in finding that the jury did not consider extraneous information concerning Turner's convictions and sentence or Tetting's incarceration.

The Wisconsin Court of Appeals affirmed the conviction. The court determined that the trial court was correct in its preliminary rulings concerning the scope of the jurors' testimony at the evidentiary hearing. In the course of its discussion, the court of appeals noted that Tetting did not sufficiently develop arguments on two points: (1) why a juror's knowledge of someone who has committed a crime is not the type of general knowledge courts expect jurors to possess, and (2) how a juror's comment about Tetting's being a "bad guy" and "from the big city" could be construed as evidence of racial bias. The court of appeals stated that, due to Tetting's failure to develop these arguments, it did not need to consider them. Nonetheless, in the alternative, the court found that (1) knowledge of someone who has committed a crime is the type of information that jurors can be expected to possess, and (2) the trial court did not err in determining that the jurors were not competent to testify about the "bad guy" and "from the big city" statements.[3]

The court of appeals next addressed whether the trial court correctly determined, based on the evidence presented at the evidentiary hearing, that no racial bias or extraneous information about reasonable doubt prejudiced the verdict. The court of appeals noted that it could overturn the trial court's findings of fact only if Tetting

---

[3] I do not understand Tetting to be claiming in his habeas petition that the state court's preliminary rulings regarding the scope of juror testimony violated his federal rights. In any event, he has not developed an argument along these lines in his briefs, and therefore any such claim would be waived. *See, e.g., King v. Litscher*, 834 F.3d 808, 815 n.1 (7th Cir. 2016). Thus, I do not further discuss the preliminary rulings.

showed that they were clearly erroneous. It then determined that Tetting had not argued that the findings were clearly erroneous. However, the court of appeals stated that, even if Tetting had made such an argument, it would conclude that the trial court's findings were not clearly erroneous.

The court of appeals next considered whether the trial court erred in finding that Tetting had not established that an extraneous definition of reasonable doubt was used or was prejudicial. Here, the court of appeals found that Tetting had not developed an argument challenging the trial court's finding that no extraneous definition of reasonable doubt was used. The court of appeals thus determined that the finding would stand, and it rejected Tetting's claim that the jury verdict was tainted by extraneous information concerning reasonable doubt.

Tetting filed a petition for review with the Wisconsin Supreme Court in which he raised the same issues he raised in the court of appeals. The petition for review was denied. Tetting then filed a motion for reconsideration of the denial, which the supreme court rejected.

Having completed his direct appeal, Tetting filed his federal habeas petition. The petition includes three grounds for relief, but in a prior order, I dismissed two of the three grounds. *See* ECF No. 12. The remaining ground alleges that the jury was racially biased and that the jury considered various forms of extraneous information. Although Tetting mentions multiple forms of potentially extraneous information in his petition, the only extraneous information Tetting discusses in his briefs is the alleged extraneous definition of reasonable doubt. He does not develop an argument relating to the jury's consideration of extraneous information relating to Turner's convictions and sentence or

8

to Tetting's incarceration. Thus, below, I address only Tetting's claim insofar as it relates to evidence of racial bias and to the extraneous definition of reasonable doubt. Any claim relating to extraneous information concerning Turner's conviction or Tetting's incarceration is waived. *See King*, 834 F.3d at 815 n.1. Moreover, because Tetting did not fairly present a claim relating to these matters during his direct appeal in state court, any such claim likely would be procedurally defaulted. *See, e.g., Blackmon v. Williams*, 823 F.3d 1088, 1100 (7th Cir. 2016).

## II. DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to a habeas petition filed by a person in custody pursuant to a judgment of a state court. *See* 28 U.S.C. § 2254. It contains a deferential standard of review that prevents a federal court from granting the writ with respect to any claim that was adjudicated on the merits in state court unless the petitioner shows that the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.* § 2254(d). The Wisconsin Court of Appeals adjudicated Tetting's claims of juror bias and consideration of extraneous information on the merits, and therefore AEDPA's deferential standard of review applies.

**A.      Racial Bias**

The respondent argues that Tetting is not entitled to habeas relief on his claim that the jury was racially biased because he cannot show that the state courts

9

unreasonably determined the facts applicable to this claim. However, an initial question is this: what facts did Tetting need to prove in order to obtain relief on his federal claim? Neither party addresses this issue in detail. Moreover, as I discuss below, it appears that the applicable law is not clearly established.

The petitioner contends that his claim is governed by the Sixth Amendment's guarantee of an impartial jury. *See* Pet., § 4, ground one. And it is probably true that a defendant's Sixth Amendment right to an impartial jury would be violated if the jury voted to convict him because of his race. However, the parties do not cite, and I have not found, a Supreme Court case that identifies what a defendant must prove in order to establish that the jury convicted him because of his race. Presumably, if all jurors testified that they would not have convicted the defendant if he were of a different race, then the defendant would have shown that his right to an impartial jury was violated. But that was not the testimony of the jurors in Tetting's case. All twelve jurors denied using race in the course of deciding the case, but two jurors remembered hearing another juror's expressing a belief that Tetting must have been guilty because he is Black and from the inner city. Would one juror's expressing this belief be enough to set aside the verdict on the ground that the jury was not impartial? I have been unable to find clearly established federal law that would answer this question.

The only federal case that Tetting cites in support of his claim is *Pena-Rodriguez v. Colorado,* __ U.S. __, 137 S. Ct. 855 (2017). That case presented the question of whether a state's no-impeachment rule—which generally prohibits jurors from testifying about what happened during their deliberations—must give way when a juror comes forward with evidence that another juror made "clear and explicit statements indicating

10

that racial animus was a significant motivating factor in his or her vote to convict." *Id.* at 861. The Court held that the Sixth Amendment right to an impartial jury trumped the no-impeachment rule, meaning that jurors must be allowed to testify about a clear and explicit statement of racial bias. *Id.* at 869. However, the Court expressly declined to identify "the appropriate standard for determining when evidence of racial bias is sufficient to require that the verdict be set aside and a new trial be granted." *Id.* at 870. In reserving this question, the Court cited two federal circuit cases reaching potentially different conclusions. *See id.* First, the Court cited *Shillcutt v. Gagnon*, 827 F.2d 1155 (7th Cir. 1987), in which the Seventh Circuit assumed that a defendant would have been denied an impartial jury if "prejudice pervaded the jury room" and there was "a substantial probability that the alleged racial slur made a difference in the outcome of the trial," *id.* at 1159. Second, the Court contrasted *Shillcutt* with the Ninth Circuit's decision in *United States v. Henley*, 238 F.3d 1111 (9th Cir. 2001), where the court indicated that a defendant would be entitled to a new trial if he showed that a single juror was racially biased, *id.* at 1120.

In the present case, the trial court did not apply Wisconsin's no-impeachment rule to block testimony about the racially biased statement. Instead, as discussed, the court held an evidentiary hearing at which all twelve jurors testified about whether such a statement was made. Thus, the state courts did not render decisions that were contrary to *Pena-Rodriguez*. The question presented here is precisely the question that the Court reserved in *Pena-Rodriguez*: when does evidence of racial bias require that a new trial be granted? Because the Court reserved the question in *Pena-Rodriguez* and

11

has not since answered it, the answer is not controlled by clearly established Supreme Court law, and AEDPA precludes a federal court from granting habeas relief.[4]

Nonetheless, I will assume for purposes of this case that if Tetting proved that one juror voted to convict him because he is Black, then he would be entitled to a new trial. But the state trial court did not find that Tetting proved this. The court acknowledged that one juror remembered another juror stating that Tetting must be guilty because he is Black and from the inner city, and that a second juror thought that something "similar" was said. Although the court initially found that a racist statement along these lines "may have been made," ECF No. 13-15 at 23, when pressed by the prosecutor for a definitive factual finding, the court confirmed that it "could not find that the statement was in fact made," *id.* at 28–29. Moreover, all twelve jurors denied making the statement and denied that Tetting's race played a role in their votes to convict. The court credited each juror's individual testimony in concluding that the verdict was not the product of race discrimination. *See id.* at 23–27. Thus, the trial court essentially found that no juror voted to convict Tetting because of his race.

On direct appeal, the Wisconsin Court of Appeals determined that the trial court's finding that no racially biased statement was made was not clearly erroneous. To obtain habeas relief under AEDPA, Tetting must show that the court's decision involved an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). In his attempt to

---

[4] Tetting cites *After Hours Welding, Inc. v. Laneil Management Co.*, where the Wisconsin Supreme Court stated that "even if only one member of a jury harbors a material prejudice, the right to trial by an impartial jury is impaired." 108 Wis. 2d 734, 740 (1982). However, decisions of the Wisconsin Supreme Court do not create clearly established federal law as determined by the Supreme Court of the United States, and therefore they cannot be used to satisfy § 2254(d)(1).

12

show that it did, Tetting argues that the trial court placed too much weight on the fact that the jurors all denied making the alleged statement. He contends that it is not surprising that whoever made the statement did not want to "own up to it in open court." Reply Br. at 1, ECF No. 18. But this line of argument relates to the credibility of the witnesses—Tetting essentially argues that one of the jurors must have been lying about not making the statement. Credibility determinations are within the domain of the trial court and generally cannot be attacked on appeal or on collateral review. *See Goodvine v. Carr*, 761 F. App'x 598, 600 (7th Cir. 2019) ("credibility findings are the unique province of trial courts"); *Gaffney v. Riverboat Servs. of Ind.*, 451 F.3d 424, 448 (7th Cir. 2006) ("a trial court's credibility determination can virtually never amount to clear error"). At the very least, I cannot say that the court of appeals unreasonably determined the facts when it concluded that the trial court did not clearly err by crediting each juror's testimony that he or she did not make the statement. Moreover, ten jurors testified that they did not even hear the alleged statement, and from the fact that two jurors testified to having heard it, the court was not *compelled* to find that the statement was made. *See Douglas v. Kingston*, 211 F. App'x 509, 513 (7th Cir. 2007) (state trial judge did not act unreasonably in concluding that the testimony of the vast majority of jurors was more credible than the testimony of two jurors). Thus, I conclude that the state courts did not unreasonably determine the facts relating to Tetting's claim of jury bias. It follows that he is not entitled to habeas relief on that claim.

B. **Extraneous Information**

Tetting's remaining claim is that his federal rights were violated by the jury's consideration of extraneous information relating to the meaning of reasonable doubt.

13

The Due Process Clause of the Fourteenth Amendment requires "a jury that determines guilt on the basis of the judge's instructions and the evidence introduced at trial, as distinct from preconceptions or other extraneous sources of decision." *Oswald v. Bertrand*, 374 F.3d 475, 477 (7th Cir.2004). If, in reaching its verdict, Tetting's jury received extraneous information that had a substantial and injurious effect on him, he would be entitled to a writ of habeas corpus. *Brecht v. Abrahamson*, 507 U.S. 619, 637, (1993); *Douglas v. Kingston*, 211 F. App'x 509, 512 (7th Cir. 2007).

As with Tetting's racial-bias claim, his extraneous-information claim turns on the state court's fact-finding. After the postconviction hearing, the trial court determined that no extraneous definition of reasonable doubt reached the jury. ECF No. 13-15 at 13. That determination was based on the testimony of the jurors, none of whom testified that any juror used a definition of reasonable doubt that he or she obtained from an extraneous source. Although some jurors testified that one juror, J.B., "brought up" a definition of reasonable doubt that was "not provided in the jury instructions," *id.* at 8–9, they did not testify that the definition came from an extraneous source, such as a dictionary. J.B. unequivocally denied making a statement regarding reasonable doubt that was derived from an extraneous source. *Id.* at 9; *see also* ECF No. 13-13 at 23–24 (J.B. testimony).

In the Wisconsin Court of Appeals, Tetting argued that the trial court wrongly credited J.B.'s unequivocal denial because it was not "far-fetched" to think that J.B. "might not want to admit in open court that he did not use the court's instructions." ECF No. 13-2 at p. 39 of 203. In his brief in this court, Tetting does not repeat this argument or otherwise develop an argument as to why the trial court's finding was unreasonable.

14

In any event, Tetting's argument in state court would not carry the day here. As I discussed above, a trial court's credibility determinations are virtually unchallengeable on appeal or collateral review. *Gaffney*, 451 F.3d at 448. While it might have been reasonable for the trial court to conclude that J.B. was lying when he testified that he did not use a definition of reasonable doubt that he derived from an extraneous source, it certainly was not *unreasonable* for the court to credit J.B.'s testimony or for the Wisconsin Court of Appeals to determine that the trial court did not clearly err in crediting his testimony. Thus, the state courts did not unreasonably determine the facts in the course of rejecting Tetting's claim that extraneous information concerning the definition of reasonable doubt reached the jury. It follows that Tetting cannot obtain federal habeas relief on this claim.

**C.      Timeliness of Tetting's Brief**

In his brief, the respondent asks me to determine whether Tetting filed his opening brief in support of his federal petition by February 28, 2020, which was the deadline I set in a prior order. *See* ECF No. 14. The Clerk of Court file-stamped the brief as received on March 2, 2020. *See* ECF No. 15. However, Tetting states at the end of his brief that he placed it in his institution's mailbox on February 28, 2020, which would make it timely under the prison mailbox rule provided that Tetting also prepaid the postage. The respondent received only electronic serviced of Tetting's brief and does not know if the envelope shows that postage was prepaid. He asks me to review the envelope and, if postage was not prepaid, dismiss the petition as a sanction for not filing the brief by the deadline.

15

I have reviewed the envelope and can confirm that it was postmarked on February 28, 2020. Thus, Tetting's brief was filed on time, and so a dismissal for failure to timely file the brief is unwarranted.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that Tetting's petition for a writ of habeas corpus is **DENIED**. The Clerk of Court shall enter final judgment. Pursuant to Rule 11 of the Rules Governing § 2254 Cases, I find that the petitioner has not made the showing required by 28 U.S.C. § 2253(c)(2), and therefore I will not issue a certificate of appealability.

Dated at Milwaukee, Wisconsin, this 7th day of July, 2020.

s/Lynn Adelman
LYNN ADELMAN
United States District Judge